May it please the Court, Counsel, I'm Lisa Hay with the Federal Defender's Office, representing the Petitioner Philip Cain. This case started when an 11-year-old girl who was being repeatedly raped by her father tried to alert adult authorities about her predicament. They didn't believe her, and instead they suggested that her uncle, Philip Cain, was molesting her. And they suggested that with quite a bit of detail, the record would suggest. The girl adopted their suggestion, eventually asserting that both Philip Cain and her father were abusing her. Philip Cain maintained his innocence throughout, but eventually pled no contest to a reduced plea offer. The father was convicted at trial, not only of the rapes that the girl had described, but also of the same touching conduct that the girl had once accused Philip Cain of. Let's fast forward how many years go by, and now she recants the story, right? Eight years later, she recants. Yes, that's correct. Okay. The judge says, I've looked at her written declaration, and if it's true, this guy's actually innocent. That's correct. Let's have a hearing. He has a hearing and says it's not he doesn't believe the recantation. Your Honor, that's exactly right. After seven years of Federal habeas litigation, two days of an evidentiary hearing, the district court issued an opinion. In a footnote, in a single sentence, the judge said that although her recantation was unequivocal, unequivocable, he said it lacked credibility. So why are we in a better position without listening to her, seeing her face to face, to say, you know, I am concerned about jumping over a credibility in terms of when the district court is looking at the individual. And also, too, I think that the State argues, and I think not without some merit, that these type of cases, recantations occur on a fairly regular basis, and there's a lot of reasons that victims do that, because there's a stigma attached to them, they don't really, they don't want, they just don't want to deal with it anymore, any number of things. So why, but it seems that the district court might have not applied the proper standard in terms of saying, I don't believe you, but there's that probabilistic standard that is the gateway to actual innocence, and you have to look at what a jury might, how it might have affected a jury. So why, rather than, wouldn't it be, we wouldn't have to say the court was wrong in its credibility, we could say you didn't apply the right standard, go back and evaluate the, I love that word, the gateway in terms of, not how, not you don't believe her, but what, how would, how would other jurors, would it have made a difference with the jurors, and look at it that way? Your Honor, I think that's one solution to send it back that way, but this Court, of course, does conduct a Schlepp review de novo, and what I would suggest is under a de novo review in this Court, you can find both that the Petitioner submitted not just the recantation, but other reliable evidence that would support finding the gateway just in this Court on a de novo review, and second, even though a credibility determination is given deference, the standard is that it can be reversed based on clear error, the Supreme Court makes this a high standard, but it's not a complete standard, it's not impossible to meet, and in this case, I think the defense has met the standard of showing clear error, and I'd like to review that, if I could. Okay, but let's just say that we did it de novo and said, I'm going hypothetically, and so we say that the, the, the, the, it, the, it was met, and so Schlepp allows the challenge. Now, the challenge is one of IAC, right? Correct. So, then that's a whole, it still doesn't mean that your client wins on that, because for all we know, then the evidence in the habeas could be any number, we don't know what counsel, we don't know what counsel had before him or her at the time, and I mean, technically, it could have been that the defendant, your client admitted to him, yeah, I did it, and so, and in light of what I'm facing, I want to take this. And so, if this court finds that the Schlepp gateway has been met, then the correct procedure would be to remand this case to the district court with a ruling that the Schlepp gateway was met based on this evidence, and that district court should now conduct a hearing or review the evidence about the ineffective assistance of counsel. And it's a different judge, by the way. But can we find that it's met without disturbing the credibility determination? I think what this court can do is follow what the Supreme Court did in House v. Bell, which was, in that case, the State asked the Supreme Court to defer to the district court's findings, and the Supreme Court said, well, we don't defer, we aren't as deferential when we aren't sure of the basis for the district court's findings. And so in House v. Bell, the Supreme Court, even though the district court had made some credibility findings, the Supreme Court undertook its own Schlepp analysis and, in that case, found the gateway had been met. So the district court made a credibility finding, it sounds like more of a credibility  I think that might be accurate, Your Honor. I call it the credibility footnote. There's really no evidence at all supporting it in the opinion, and I think there's quite an amount of evidence to show that, in fact, it's not supported. And if I could review some of the stuff. Okay. So if that's the case, what do we do? We can't send it back to Judge Hogan to expand his ruling. He's not there anymore. So what do we do? Your Honor, I think this Court can, on de novo review, look at the Schlepp evidence itself, and there's a great deal of evidence that shows that this defendant has met the actual innocent gateway. So in this Court itself, looking at both of these. So just thinking about how we could write this up, we could say that the credibility, whatever it is, footnote, conclusion, finding is not explained and it's not otherwise supported by the record. Exactly. And then, quoting House v. Bell, they say when the Court's uncertain about the basis of some of the district court's conclusions, that weakens reliance on the district court's determination, and therefore, this Court engages in a full Schlepp analysis as the Supreme Court did in House v. Bell. In that case, I think the evidence does show that this victim's recantation was credible, was reliable. We can't, but we wouldn't have to say she was credible. We could just say that the gateway, that the burden was met on the gateway, and then the judge that does the, entertains the IAC could then make a determination. That's correct. We could say that. I mean, because it would seem, it seems counterintuitive to say, okay, Judge Hogan, your findings were not sufficient, but then we're not even going to look at her and we're just going to say she's credible and presume her credibility for the, I understand why you would love that, but I think. But in answer, I mean, part of Judge Callahan's analysis, we already have Judge Hogan on the record saying if this is true, he's actually innocent. I mean, so. Correct. So I don't think we need to make a finding in this case that her recantation is, in fact, true. I think what can be said is that under the Schlupp gateway, if all of this evidence had been presented to a jury, would a reasonable jury have had a reasonable doubt? And there can seem to be no question that if you had these competing statements by the same person, the 11-year-old victim and the 25-year-old, they were presented to the jury, along with other evidence that we would, that we presented in the district court, that a reasonable jury would have a reasonable doubt. And that's enough to meet the Schlupp standard without saying one way or another whether he's actually innocent of this case, because we don't have to prove actual pure innocence for a gateway standard. It's just whether the evidence would cast doubt on the credibility of the guilty verdict. In this case the claim is IAC. Eventually, we would get to the IAC claim, exactly. I did want to make sure the Court understood that we're, we believe we presented evidence other than just the recantation. Judge Hogan's footnote specifically says the recantation was not credible, but he refers in his opinion to the victim's testimony. And I think that recognizes that we presented testimony, not just the recantation. The testimony under oath explained the pressures that this young girl felt when she reported the abuse and her cousin didn't believe her. The evidence is undisputed that he pressured her to try to disclose. And when she said it was her father, he told her he didn't think it was, he thought it was the uncle. That's the beginning of the story. The other part of the story is that the father, the mother, and the cousin, who were concerned about abuse, met before they ever confronted the young girl, and they came up with their thoughts about what maybe they had seen, what their observations were. And we know today that the father was sexually abusing this young girl, and that he had heard a month before from the doctor that maybe the doctor was suspicious. That's what the father believed. So he has every reason, of course, to deflect attention from himself and to Mr. Cain. So when the State says that this young girl made statements without prompting and that that's a reason you can rely on her earlier statements, that's really not a fair reading of the evidence. When she was first asked about abuse, the father had already poisoned the well within the family by saying, I saw Phil Cain sexually touching my daughter in the following ways. And it turns out those are the exact things that he's accused of doing and he's convicted of at trial, not only the rapes, but that sexual touching. So the father's statements, trying to deflect attention from himself, poisoned that well. Whenever this girl is making statements about Uncle Phil, it's in the context of the case. And so the State's claim is that she was sexually assaulted, and that's a reason  And I think when the State came out, that someone went back to her and she said, no, yeah, it is true about the father, but it's still true about your client, right? She was back to her guns back then. Right. And I think the State asked, well, why would she in foster care keep mentioning the uncle when she's safe? And I think that's perhaps asking too much of an 11-year-old who hasn't been believed, who has been feeling unsafe, who finally finds that adults are listening to her to ask her to retract part of her statement and not all of it. She found that when she accused Uncle Phil, she got safety. She got taken into foster care, and the adults all seemed to approve her. And so she continued that. I don't think we need to ask further, well, what could be the motivation? It seems clear that an 11-year-old could fairly believe that once she made this statement and everybody approved, she had to stick to it. Well, and actually, too, there are a lot of victims are molested more than one time because they have parents that don't protect them. So it's not that that's not the fact that there are two people that could have actually that it's not impossible to believe that two people could have molested the same child, because it happens. Sure. It's not impossible to believe, but the question for a jury would be beyond a reasonable doubt, was there evidence that the uncle did this? And I think with all the evidence we put together, the answer is no. The one point I want to be sure to make before I reserve a few minutes for rebuttal is that at the no contest plea, what the district attorney said was that there's no evidence of motivation, that they asked Uncle Phil, Uncle Phil Cain, why would she make up an allegation like this, and Phil Cain could not come up with any reason she would have any motivation. And that's part of the record on which he pled guilty. But today we know the motivation. We have so much more evidence because she testified at trial, testified at the evidentiary hearing about her motivations. That's not Excuse me. I didn't mean to interrupt your sentence. Go ahead. No. So that's not her recantation. That's her actual, her memory about how she felt back then as an 11-year-old, and that's new. I just wanted to double check a jurisdictional point. He is out of prison now. Is that right? That's correct. He's finished serving his sentence. Is he on parole now? He served all of his parole without incident. All that's left is lifetime registration as a sex offender. Is that enough to give us habeas jurisdiction? I believe it is because, first, this was filed while he still was serving parole, and, second, the lifetime sex offender registration is considered an impediment that gives you jurisdiction. Is there a case that says that or? I don't have it on the tip of my tongue, but I'm certain there is one. I believe it's from the circuit. Yes. Okay. I'll reserve the last two minutes for rebuttal. Thank you. Thank you. Good morning. May it please the Court. I'm Rolf Moen, representing the State of Oregon. Do we have jurisdiction? The State hasn't disputed that there's jurisdiction. I don't know the answer to your question about whether there's a case that stands for the proposition that Ms. Hay was asserting. It is true that Petitioner is subject to lifetime registration. I know the U.S. Supreme Court, at least in a case I can't remember the name of, has suggested that there's sort of a presumption that there are collateral consequences that continue to attach to any conviction. That's a pretty serious one. That's true. I mean, these are serious. This is not just he can't vote and so on. This is sex offender registration carries with it lots of restraints on liberty. Yeah. Sure. So like I say, we haven't disputed jurisdiction. I know you haven't disputed. I just we have to make sure we have it. I understand. It would be nice if we had a case that tells us one way or the other. I understand. In any event, Petitioner did not meet his burden in this case of proving that it's more likely than not that no reasonable juror would convict. But it's not the standard that the Court applied. It seems to me, I mean, it was pretty truncated, and the Court just said that he, you know, didn't find her credible on her recantation from his perspective. I think the Court did apply the correct standard. At ER-3, the district court cited House for the proposition that it was Petitioner's burden to show. Okay. I've got the district court order in front of me. Where are you pointing me to? ER-3. ER-3. Okay. I'm on page 3 of the order. Is that ER-3? I think that's correct. Okay. So where am I looking? At the bottom of the page, the bottom last paragraph, to pass through the Schlepp gateway, Petitioner must demonstrate that more likely than not, in light of new evidence presented to the Court, no reasonable juror would find him guilty beyond a reasonable doubt. So, yeah, that's his – he's just reciting the case law. And at ER-11, ER-10 and 11, the district court wrote, quote, Petitioner has failed to make a sufficient showing to pass through the Schlepp gateway, unquote. And it's also clear – And the footnote to that says, the Court finds her recantation now to lack credibility. That's correct also. And it's also evident from the district court's opinion at ER-4 through 6, the Court is referring – seems to be referring to Petitioner's evidence generally. In other words, not referring exclusively to the victim's recantation testimony in court. The Court is also referring to some of the other information that had been presented to it. So I think it's fair to say, based on the district court's written conclusions, that it was applying the Schlepp standard. It was requiring Petitioner to prove that more likely than not, no reasonable juror would have convicted based on the information presented. Okay. Let's assume he used that short, truncated expression as a shorthand for the long explanation of what the standard is. I don't see any support for it. He just says it. Well, the question is on Nova Review with respect to whether that ultimate standard was satisfied, whether the record as a whole permitted the Court to reach that conclusion. Right. That's what I'm struggling with. I don't see how he gets there. Well, I think there's certainly ample support in the record for the ultimate conclusion reached by the district court. And first and most significantly is that the district court did expressly find that the victim's recantation testimony was not credible. In what respect? I mean, was she giggling or was she caught in inconsistent statements? Why was it deemed incredible? Well, we don't know the precise reasoning the district court used. But the real question in reviewing the credibility finding for clear error is whether in light of the record as a whole, this Court can say that the district court's ultimate credibility finding was permissible. In other words, in the record, what did we put our finger on to say there's something in the record that would support that? I think aside from the fact that the district court had the chance to assess the victim's demeanor in person. He doesn't comment on her demeanor. Pardon me? The demeanor is not in the record. So, I mean, I'm looking for where in the record he doesn't say, you know, I don't believe her because of her demeanor, she was inappropriate on the witness stand or. So what can we look at in the record to support it? I think the record, in at least four different ways, supports and is consistent with the district court's conclusion and finding that the recantation was not credible. First, Petitioner himself had failed a polygraph exam in 1996. But we don't know that that's what the district court relied on. You know, and so that's the whole thing, that credibility is so on site and in the mind of the person that makes the call. And then even though you're saying here are the reasons that you could have found that she's not credible, but then we're not looking at her. So that causes me a problem. And then, but then counsel for the appellant wants to, wants us to say she was not credible, but then we have a problem with that, too. And I understand that it's certainly much easier for any appellate court to, to review a credibility determination when, when the court. To come back to the polygraph, are you suggesting that Judge Hogan relied on his failing the polygraph early on as part of his conclusion that she lacked credibility and, therefore, that she failed, that he fails to satisfy Schlupp? I'm suggesting simply that the question before this Court was whether the record as a whole contains information making the district court's credibility finding a permissible finding. Yeah, but you see, now we come back to Schlupp. I don't really care about the district judge's credibility finding, except as it helps him understanding, understand Schlupp. And the question in Schlupp is whether or not the jury confronted with the evidence that could come before the jury would find him, find him guilty beyond a reasonable doubt. The jury is never going to find out about the polygraph because it's not admissible. That would be true in a, in a criminal trial, if you're reviewing evidence that's admissible in a criminal trial. And Schlupp tells us what would the jury do in the criminal trial with this evidence. And if the evidence of the polygraph can't come in, it is totally irrelevant to Schlupp. It may be relevant to what Judge Hogan does as to whether he believes her, but it's irrelevant as to Schlupp. I disagree that it's irrelevant as to Schlupp because I think there is, I think in assessing actual innocence, courts, in fact, are expected to review all information presented. Well, but actual innocence in the Herrera sense, that might be right. But actual innocence in the Schlupp test, given the way the Court has formulated the test for us, it is, what would the jury have concluded? And if we're asking what the jury would have concluded, the only thing we get to look at is what the evidence is that would have come before the jury. Well, again, I disagree with that proposition. But even if we put aside the question of what the jury would have concluded, what would the jury have concluded? Well, I know in my brief I've cited Doe and Judge Sotomayor's opinion, explaining that when you're assessing actual innocence, courts are not restricted to only evidence that would have been admissible at the criminal trial. The real underlying question is factual innocence. But the jury is not going to assess actual innocence. What the jury will assess is his guilt or innocence of the crime. So the – I haven't even thought of that because we don't talk about cases before. But I think that's a good point that Judge Fletcher is making. Well, and even if we do set aside the polygraph evidence. Yes, you've got three more, you said. Okay. You've got three more points. Certainly. Okay. Next. A reasonable juror, in light of the other information presented – well, let me put it the other way. Petitioner hasn't proved that no reasonable juror, in light of the evidence presented, would have voted to convict. And the other evidence in the record, first of all, undermining the victim's recantation, would have been the victim's own statements about her own memory. She was first asked about abuse that had occurred eight years previously. She stated to Petitioner's investigator, I'm not sure I can even remember, and I kind of just blocked it all out of my mind, some of her own statements to second to the investigator suggested that Petitioner, in fact, was guilty. She initially told the investigator, Petitioner, quote, touched me a couple of times, unquote. She was an adult. Well, wait a minute, wait a minute. And then she said, please read on. She said it wasn't bad, quote, unquote, and I'd like to talk about both parts in turn. Yes, but no, if you're going to read the quote, you'd better read the whole one. I was planning to get into the second part, Your Honor, but I appreciate your concern. In referring to, he touched me a couple of times, I think a reasonable inference is that the victim, who's 19 at the time she made that statement, would not have referred to these touches and would not have thought they were noteworthy unless she was, in fact, referring to inappropriate or sexual touches. And in saying that it wasn't bad, I think one can infer that that has to be understood in context. Compared to the many, many rapes her own father had subjected her to, she may have thought that these touches weren't bad, even if they were criminal. And it was not. Okay, but we don't really know how, what the judge thought about that. That's true. We do know, however, from at ER 202, Dr. Spears, Petitioner's own expert, conceded that it's, quote, certainly a possibility, unquote, that compared to the rapes that the victim was subjected to by her father, the victim, quote, may not think that lesser abuse is such a big deal, unquote. So there's also that piece of testimony supporting an inference that when the Petitioner was referring to the touches, I'm sorry, when the victim was referring to Petitioner touching her a couple of times, she was, in fact, referring to criminal conduct. And fourth, there are also plenty of other reasons in the record involving the Petitioner or the victim's initial allegations of abuse by Petitioner, suggesting that those allegations were, in fact, truthful and more credible than the later recantation. The victim did repeatedly and consistently describe Petitioner as touching her breasts and her vagina. She made those statements to multiple people on multiple occasions. She made those statements to her foster parents. She made them to police officers. She made them to those who interviewed her at the CARES Center, which assessed her and evaluated her. And I'd also like to point out that when the victim made her allegations, she generally was simultaneously alleging both that Petitioner sexually abused her and that her father had raped her. Even and I'd point the Court to a number of pages in the ER, 17, 23, 26, 69, and 72. Those each document various statements that the victim made to various people. And in each of those statements, it appears that she is first referring to Petitioner's sexual abuse and only after that talking about her father's sexual abuse. And although Petitioner notes that the victim had been subjected to family pressure and although the family was trying to influence her to accuse Petitioner of raping her and not the father, ultimately the Petitioner did not bow to family pressure. She continued in the end to maintain that her father had, in fact, raped her repeatedly, but she also continued to allege that Petitioner had sexually abused her. Let me ask you this. I understand Ms. Hay to be requesting that we find that the actual innocence test has been met so that his failure to comply with the statute of limitations is excused. I was asking her about the possibility of remanding it for additional findings explaining the credibility thing of Judge Hogan, but of course Judge Hogan is not on the bench anymore. Is there any lesser relief that we can grant or is it a winner-take-all sort of thing? To be honest, I'm not sure. It is, if the Court really wanted further explanation from the district court judge who made the findings, then yes, that's problematic. But I would like to return to my earlier point about the credibility finding, which is that that finding has to be reviewed for clear error and that really means that the legal question before the Court is whether looking at the record as a whole, the credibility finding can be described as a permissible finding. In other words, a finding that can be described as reasonably available given the record as a whole, even if other competing different inferences were available from that same record. And so in the State's view, there's no – there wouldn't be any need to remand for additional factual findings, even if that was a workable solution. I'm having trouble – not because of any argument you're making. I'm just having trouble conceptually with our standard of review. If the question in front of Judge Hogan were, is she credible, do you believe her? And in the ordinary way that a fact finding comes in front of a district judge, you're clearly right that that would be clear error. But that's not quite the question that was in front of him. The question in front of him was, what's a jury like to do with this evidence? And at that point, I don't know that we review for clear error because we're not being asked what he thought, at least directly. On the other hand, we are being asked, in a sense, what did he think because he's in a better position to estimate what a jury would have thought than we are because, of course, he did see her, and we've got the transcript and the declaration. So I'm kind of halfway between. And I understand, partly because I think the actual innocence – the Gateway standard is – it's a little bit confusing when you try to figure out the nuts and bolts of how the standard is supposed to be applied, but – Well, I'm not having trouble with what the standard is. I'm having trouble with our standard of review as to what Judge Hogan did. Sure. But my point is, when you're looking at credibility findings in this context, they really, to a great extent, are to be dealt with in the same way that they would be in other cases because, for one thing – Do we have any cases that tell us what to do with this little nuance? I've never seen one. There may be one, but I'm not aware of it. I don't know of any cases that directly, explicitly address this point. But I do note that in both Schlupp and in this Court's Lee decision, the Court noted in the actual innocence context that the habeas court, quote, may have to make some credibility assessment. Did Judge Hogan just go senior or did he completely retire? To be honest, I don't know. I understand he retired. But the other important point is that the House and Schlupp contained support for the proposition that the U.S. Supreme Court has really equated credibility and reliability as sort of the same things in the actual innocence context, which suggests that if a district court has expressly found a certain piece of evidence not credible, that's implicitly the same as saying it's not reliable. If it's not reliable, that should mean that, for practical purposes, it really falls out of the equation when you're applying the actual innocence gateway standard because the prerequisite is that the Petitioner first has to present new, reliable evidence. And so for that reason as well, I think the credibility finding here is particularly significant. Do we have anything in the record that tells us the degree to which or even whether Judge Hogan was conscious of the failure of Mr. Cain to pass the lie detector test early on? Was that in the record before him to start out with? Well, it certainly was in the record that was before him. Was that argued to him as a reason why he should deny the Schlupp gateway? I can't remember if the State expressly referred to it or not. I'm sorry. But certainly it's part of the record that was before him. And there's nothing to suggest that he was doing anything other than looking at the entire record in reaching his ultimate conclusion about whether Petitioner satisfied the Schlupp standard. And I just simply don't know this. And I'm guessing that you don't know the answer either. But if you do, it would be helpful. Did Judge Hogan ever mention at any point during the proceeding Mr. Cain's failure to pass the lie detector test? I don't recall seeing him refer to it in the transcript. It doesn't mean it couldn't be there, but I don't remember seeing it. Okay. Thank you, Mr. Rohn. So unless the Court has other questions, I'll rest on my brief. Good. Ms. Hay. I'd like to try to address a few of the questions that were raised. First, Judge Hogan did retire. He didn't take senior status. Judge Hogan did refer to it. Hold the mic a little closer. No, thanks. Judge Hogan did refer to the polygraph during the evidentiary hearing. I don't have the page in front of me, but I am aware that he did refer to Mr. Cain's polygraph, not in any. How did that come in? How did that get into evidence? Why is that admissible? There wasn't an argument about admissibility because in a Federal habeas hearing, any evidence could come in. And I actually agree with the State in this case, unfortunately, that under this Court's decision in Levy-Lampert, evidence that's not admissible can be reviewed during the Schlupp gateway. That's evidence admissible or not, is the quote from Levy-Lampert. So a polygraph, even though not admissible, can be considered in the Schlupp gateway. The issue is that polygraphs, as we know, are not considered reliable in the Oregon courts. They often have undue influence, and so that lack of reliability has to be taken into consideration. But I don't dispute the State's right that that's one factor. The other factors the State relies on, however, I think are important to look at. The Court asked about demeanor. During the evidentiary hearing, the habeas hearing, the Petitioner's counsel did argue that her demeanor supported credibility, and that was without any contest by this State. In contrast, the 11-year-old's demeanor, I think we should fairly contrast the two, right? Her demeanor was referred to as confused at ER 50, and the social services workers said they were concerned about her ability to accurately relate events, and her honesty was compromised, and that's at ER 93. So when we're comparing two statements, on the one hand, we have nothing except something positive from her own counsel about the 25-year-old's demeanor. The 11-year-old, we have negative statements about her demeanor. On the question about the memory and whether maybe this 25-year-old or then 19-year-old was misremembering, I think the Court accurately was pointing out that the statements about bad touching were actually more detailed. She said, if he touched me, it wasn't bad. He didn't do anything bad to me, and I'm at ER 27. The investigator then wanted to clarify, and he asked, well, what do you mean exactly? When she said, Uncle Phil touching her, she says, Uncle Phil never touched me sexually, not at all. And then she describes sometimes where he may have physically touched her body, but not sexually. So I think that question has been clarified in the record and is not disputed. When the State talked about the motive of AJ to possibly maintain her stance because he did sexually abuse her and she's hostile, that doesn't make any sense at all. Why would a young woman exonerate somebody who abused her and she's hostile to him? It's actually a contrary argument and favors the defense. Okay. Thank you, Ms. Hayes. Thank you. Mr. Moen, thank you. The case just argued is submitted.
judges: Silverman, Fletcher, Callahan